[Cite as *State v. Regulus*, 2013-Ohio-507.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 25177 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 11-CR-4002 |
| v. | : | |
| | : | |
| ANTHONY REGULUS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of February, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHELE D. PHIPPS, Atty. Reg. #0069829, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

SUSAN F. SOUTHER, Atty. Reg. #00585529, Law Office of the Public Defender, 117 South Main Street, Suite 400, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1}    Anthony Regulus appeals from his conviction and sentence following a

no-contest plea to charges of carrying a concealed weapon and having a weapon while under

disability.

{¶ 2}    Regulus advances two assignments of error challenging the trial court's ruling on a suppression motion. First, he contends the trial court erred in finding that a sheriff's deputy had reasonable, articulable suspicion for a *Terry* stop. Second, he claims the trial court erred in finding that the deputy had a reasonable, individualized suspicion that he was armed to justify a weapons frisk.

{¶ 3}    The record reflects that the trial court held a February 3, 2012 hearing on Regulus's suppression motion. The only witnesses at the hearing were deputies K.J. Baranyi and Anthony Rolfes. Baranyi testified that he and his partner, Deputy Donohoo,  were in a marked cruiser patrolling Northtown shopping center in Harrison Township on the morning of November 25, 2011. All of the businesses were closed, and no cars were in the parking lot. Baranyi testified that the shopping center had a recent history of breaking-and-entering crimes being committed, and the area had a history of drug transactions, shots fired, and other weapons-related offenses.

{¶ 4}    At 6:43 a.m., Baranyi pulled his cruiser into the rear parking lot and saw two people walking "in the shadow" behind the shopping center. The subjects, who later were identified as Regulus and Sedric Ward, were not walking in an alley or lane adjacent to the parking lot. Rather, they "were walking between a dumpster behind [a] Save-a-Lot store directly toward the fenced area behind [a] Handyman Store." (Doc. #17 at 3). Because of the "very dim" lighting, Baranyi shined his cruiser's spotlight on the men. He was concerned "'[d]ue to businesses being broken into in the past as well as being dark outside.'" (*Id*.). Baranyi admitted, however, that he was not responding to a call and that the men were not doing anything other than walking behind a closed business.

{¶ 5}    Baranyi exited his cruiser, approached the men, and asked what they were doing. The two men stopped walking. They explained that they were going home, and Regulus pointed toward Bennington Drive, which was in the general direction they were heading. Baranyi proceeded to ask for identification, which Ward produced and Regulus lacked. Baranyi then asked whether they had weapons or anything else on them. The two men stood there and did not respond. Baranyi became concerned "[t]hat they might have something on them [and] [t]hat's why they didn't answer the question." (Suppression Tr. at 12). Specifically, he was concerned they might have a weapon. (*Id.*).

{¶ 6}    Baranyi and his partner proceeded to frisk the men. As Baranyi frisked Regulus, he felt a hard object in Regulus's back pocket and what he believed to be the trigger guard of a firearm. Deputy Rolfes then arrived and removed a handgun from Regulus's back pocket. Baranyi arrested Regulus at that point.

{¶ 7}    In overruling Regulus's suppression motion, the trial court found that Baranyi had reasonable, articulable suspicion of criminal activity to justify a brief investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The trial court also found that Baranyi had a "reasonable, articulable and individualized suspicion that Regulus may have been armed and dangerous," thereby justifying a weapons frisk. In reaching this conclusion, the trial court relied, in part, on Regulus's failure to answer when asked whether he had a weapon. After the trial court overruled his suppression motion, Regulus pled no contest to the charges against him. The trial court imposed an aggregate twelve-month prison sentence. This appeal followed.

{¶ 8}    As set forth above, both assignments of error challenge the trial court's

suppression ruling. When reviewing a trial court's ruling on a motion to suppress evidence, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Morgan*, 2d Dist. Montgomery No. 18985, 2002-Ohio-268. However, "the reviewing court must independently determine, as a matter of law, whether the facts meet the appropriate legal standard." *Id.*

{¶ 9} In his first assignment of error, Regulus challenges the trial court finding that Baranyi had reasonable, articulable suspicion of criminal activity to justify a *Terry* stop. In support, he emphasizes that (1) the deputies were not dispatched to the shopping center, (2) they were not responding to a call about suspicious people, (3) he was walking in the early morning, not the middle of the night, (4) the deputies did not observe him looking in windows or doing anything criminal or suspicious, (5) the deputies did not know him or his companion, (6) he stopped for the deputies, and (7) he was heading home. Although Regulus admits he was "taking a short-cut behind the shopping center near the dumpster instead of staying on the alleyway," he maintains that "this [fact] standing alone should not be considered suspicious."

{¶ 10} Upon review, we find no error in the trial court's determination that a *Terry* stop was justified. A police officer briefly may detain an individual without an arrest warrant or probable cause for an arrest to investigate if the officer has reasonable suspicion of criminal activity. To do so, the officer "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Andrews*, 57 Ohio St.3d 86, 87, 565 N.E.2d 1271 (1991), quoting *Terry* at 21. The propriety of an investigative stop must be viewed under the totality of the circumstances, which themselves must "be viewed through the eyes of a reasonable and cautious police

officer on the scene, guided by his experience and training." *State v. Bobo*, 37 Ohio St.3d 177, 179, 524 N.E.2d 489 (1988).

{¶ 11} Here we conclude that Baranyi had reasonable, articulable suspicion of criminal activity to justify briefly detaining Regulus under *Terry*. In support of its ruling, the trial court cited the following facts, which are based on uncontroverted suppression-hearing testimony: (1) Northtown shopping center is a "high crime area," with recent reports of breaking and entering as well as shots fired, weapons, drugs, and robberies, (2) Regulus and his companion were seen at the rear of the shopping center walking "in the shadow," (3) all businesses in the shopping center were closed, and the parking lot was empty, (4) Regulus and Ward were not walking in the alley or lane adjacent to the parking lot—instead they were walking "directly toward the fenced area behind the Handyman Store," and (5) although Regulus claimed to be walking home, he "was walking near the closed business heading directly toward the fence."

{¶ 12} The trial court especially noted the location where Regulus and Ward were walking. It reasoned:

> This Court attaches particular significance to the fact that Regulus and Ward were not walking on the alleyway or lane, where persons without criminal intent more likely would be walking at that time of day. This factor tipped the balance in favor of this Court's ruling the deputies had a lawful basis to conduct a *Terry* stop and detention. This Court would not have so ruled had this factor not been present.

(Doc. #17 at 10).

**{¶ 13}** As for Regulus's claim that he was walking home despite being headed toward a fenced area behind a closed business, the trial court added:

> With regard to this factor, this Court finds that Regulus and Ward had not yet been stopped or detained by the deputies. They were not ordered or told to stop. There is no definitive evidence either deputy drew his weapon. The deputies spoke in a normal—not a commanding—tone of voice. Thus, this Court finds that at this specific point in time, the liberty of Regulus and Ward had not yet been restrained—and the mandates of the Fourth Amendment had not yet been triggered.

(*Id.* at 11).

**{¶ 14}** We agree with the trial court that Regulus and Ward had not been restrained or seized when Regulus claimed to be walking home. Although Baranyi had shined a spotlight on the two men, he did not order them to stop. After shining the light, he simply approached them and asked, in a normal tone of voice, what they were doing behind the building. (Suppression Tr. at 59-60). Regulus and Ward responded by stopping walking and telling the officers that they were heading home. Baranyi's use of a spotlight did not transform the encounter into a seizure. *State v. Carter*, 2d Dist. Montgomery No. 19833, 2004-Ohio-454, ¶20 ("From Carter's point of view, two police officers were simply approaching his vehicle, evidently desiring to speak to him. The fact that they used the cruiser spotlight to illuminate the vehicle before doing so did not constitute a show of force or authority sufficient to make this encounter a stop."); *State v. Green*, 2d Dist. Greene No. 2008 CA 104, 2009-Ohio-2540, ¶18 (finding no seizure where an officer pulled behind a stopped vehicle and shined a spotlight on the car).

{¶ 15} We also agree with the trial court that the totality of the facts and circumstances known to Baranyi, an officer with seven years of experience, gave him reasonable suspicion of criminal activity. While it was dark outside, Baranyi observed Regulus and Ward walking in the shadows toward a fenced area behind a closed business. Although the two men claimed to be going home, they were not in the alleyway or lane. Instead, they were walking near the business in an area known for criminal activity, including recent reports of breaking and entering at this shopping center. We believe these facts justified a brief investigatory detention. Accordingly, the first assignment of error is overruled.

{¶ 16} In his second assignment of error, Regulus claims the trial court erred in finding that Baranyi had a reasonable, individualized suspicion that he was armed to justify a weapons frisk. Regulus notes that (1) Baranyi observed no furtive movements, (2) he and Ward had stopped walking, (3) Baranyi witnessed no criminal activity, (4) Baranyi was not "outnumbered," and (5) Baranyi was not in fear for his safety when he first approached the two men. Regulus argues that a weapons frisk was not justified by either his failure to respond when asked whether he had a weapon or by Baranyi's characterization of the shopping center as a "high crime" area. Finally, Regulus attempts to distinguish *State v. Simmons*, 2d Dist. Montgomery No. 8936 (Jan. 29, 1985), upon which the trial court relied.

{¶ 17} It is well settled that "[a]uthority to conduct a patdown search for weapons does not automatically flow from a lawful stop[.]" *State v. Stewart*, 2d Dist. Montgomery No. 19961, 2004-Ohio-1319, ¶16. When a lawful stop is made, an officer may conduct a limited search for weapons if the officer reasonably believes the suspect may be armed. *State v. Evans*, 67 Ohio St.3d 405, 408, 618 N.E.2d 162 (1993). To justify a weapons frisk, an officer must point to specific, articulable facts that create a "reasonable individualized suspicion that

the suspect is armed and dangerous[.]" *State v. Roberts*, 2d Dist. Montgomery No. 23219, 2010-Ohio-300, ¶18. A suspect's location in a high crime area alone will not justify a weapons frisk. *Id.*

{¶ 18}   Although the issue is perhaps close, we agree with the trial court that Baranyi had the requisite individualized suspicion when he frisked Regulus for weapons. In reaching this conclusion, we note that the present case does not involve a defendant being charged with a crime for failing to answer an officer's question. Nor does it involve a defendant's post-arrest silence being used against him at trial. The only issue before us is whether Baranyi was entitled to consider the fact that Regulus had answered questions about his identity and what he was doing but had refused to answer a question about whether he was carrying a weapon. Baranyi inferred from the lack of a response that Regulus might be armed. We believe this inference was permissible and reasonable under the totality of the circumstances.

{¶ 19}   While Regulus had a right not to answer, and his refusal to answer itself could not be made criminal, "it does not necessarily follow that [a] suspect's refusal must be ignored completely by the officer." 2 LaFave, *Search and Seizure* Section 3.6(f) (4th Ed. 2004). "Though it has occasionally been held that 'no adverse inference may be drawn' from a refusal to respond, the better view is that refusal to answer is one factor which an officer may consider, together with the evidence that gave rise to his prior suspicion, in determining whether there are grounds for [a weapons frisk]."[1] *Id.* "'It may be said that a man has * * * the constitutional right * * * to refuse to answer incriminating questions, so that his refusal to

[1] The quoted passage addresses establishing grounds to arrest. We believe the same reasoning applies, with at least equal strength, in the case of a weapons frisk.

answer is not a circumstance of suspicion. But this would appear to be too legalistic a view.'" *Id.*, quoting Williams, *Arrest for Felony at Common Law*, 1954 Crim. L.Rev. 408, 413. "After all, the policeman is not trying the guilt of the accused, but is only making an administrative decision whether to [frisk]." *Id.*

{¶ 20} Notably, this court already has held that an officer may consider a lawfully detained person's refusal to answer a question about the presence of a gun when deciding to conduct a weapons frisk. In *State v. Simmons*, 2d Dist. Montgomery No. 8936 (Jan. 29, 1985), a police officer made a traffic stop in a high-crime area at 2:30 a.m. The officer asked the driver to wait in the police cruiser while he completed a citation. When the officer and the driver reached the cruiser, the officer asked whether the driver had any guns, knives, or other weapons on him. The driver did not respond. The officer frisked the driver and found a handgun in the driver's front pocket. On appeal, this court found the frisk lawful. Discussing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), this court noted that a bulge in a suspect's clothing during a traffic stop was enough to justify a weapons frisk. This court then reasoned:

> In the present case, the defendant's failure to respond to a direct question about the presence of weapons was probably more telltale than the "bulges" in [*Mimms* and another case], but in all such cases involving Fourth Amendment rights, the ultimate test is whether the actions of the arresting officer were reasonable under all of the existing facts and circumstances. * * *
>
> With a view to the picture depicted by the evidence in this case, including the time and place of the traffic violation, Simmons was not

subjected to any unwarranted indignity or embarrassment, and on balance, the inconvenience to him was minimal when measured against legitimate concerns for the safety of Officer Lowe. At another time, on another day, and in a different setting, any similar conduct by a police officer could prove to be an unconstitutional invasion of private rights, but otherwise prudent officers are not required to masquerade as fools under conditions and in situations where their own safety reasonably might be at stake.

In dealing, as we must, with the practicalities induced by real life and live people, the frisk which produced the handgun in this case was not unreasonable under the circumstances existing at 2:30 a.m. on Salem Avenue.

* * *

{¶ 21} Even though a suspect's refusal to answer a question about being armed may not always justify a search for weapons, we conclude, as we did in *Simmons*, that Regulus's refusal to respond was a relevant consideration and that the totality of the circumstances justified a weapons frisk. Indeed, the circumstances justifying a weapons frisk are more compelling here than they were in *Simmons*, which involved a routine traffic stop. As set forth above, Baranyi happened upon two men walking in the dark near a closed business in a shopping center with a recent history of breaking-and-entering offenses. The men responded when asked what they were doing and who they were. They "just stood there" and did not answer, however, when asked whether they were carrying any weapons. (Suppression Tr. at 57). The U.S. Supreme Court has recognized that "the determination of reasonable suspicion must be based on common sense judgments and inferences about human behavior." *Illinois v.*

*Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). Here, we believe Baranyi made a common sense judgment and drew a reasonable inference that Regulus might be armed based on his refusal to answer a question about weapons and the other facts and circumstances known to the deputy. Therefore, we hold that the weapons frisk was constitutionally permissible.[2] The second assignment of error is overruled.

{¶ 22}   The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

FAIN, P.J., concurs.

FROELICH, J., concurring:

{¶ 23}   I agree with the majority that the totality of the circumstances authorized a brief investigative detention and a patdown.

{¶ 24}   The constitutional danger in situations such as this is that every time there is a lawful detention, the officer could ask if the individual had any weapons.  A "yes" answer could give reasonable and articulable suspicion for a frisk, but would no response or a "tentative" "no" answer have the same result?  I write separately only to emphasize the

---

[2] *Compare U.S. v. Noble*, 364 Fed.Appx. 961, 965 (6th Cir.2010) ("We find that the officers had a reasonable belief that Noble may be armed because of their suspicion that he was involved in illegal drug activity * * * and Noble's lack of response when asked if he had a weapon, along with the officers' experience that persons engaged in drug activity are often armed."); *see, also, Fitzpatrick v. Fort Wayne*, 679 F.Supp.2d 947, 951 (N.D.Ind.2009) ("This brings the analysis to the principal thrust of Fitzpatrick's instruction, the incorrect legal proposition that Lemon could not consider D.F.'s silence in response to questioning as a basis for determining probable cause to arrest. Indeed, contrary to Fitzpatrick's instruction, and consistent with the Court's instruction on probable cause, Lemon was entitled to consider what he knew—that D.F. and the other boys had not been responsive to his simple questions.").

majority opinion, supra ¶ 21, that a lawful *Terry* detention, followed by a non-response to a question about a weapon, does not automatically bootstrap itself into a lawful frisk.

. . . . . . . . . . . . .

Copies mailed to:

Mathias H. Heck
Michele D. Phipps
Susan F. Souther
Hon. Dennis J. Langer